IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Case No. 3:10cr0236 |
| | ) | JUDGE HAYNES |
| TERRENCE DEANGELO WHITSON | ) | |

MEMORANDUM

The United States of America filed this criminal action against Defendant Terence Deangelo Whitson, charging him as a felon in possession of a firearm.

Before the Court is Defendant's motion to suppress (Docket Entry No. 22), to which the Government responded (Docket Entry No. 23), and Defendant filed a reply. (Docket Entry No. 28). The Defendant seeks the suppression of all evidence obtained as a result of a police stop of him on a public sidewalk next to the James Casey Housing Development in Nashville on April 16, 2010. Specifically, Defendant contends that a police officer seized him without reasonable suspicion. The Court held a suppression hearing on April 18, 2011, and both parties submitted post hearing briefs. (Docket Entry Nos. 34, 35).

A. ANALYSIS OF THE EVIDENCE

John Jayne and Matthew Norris, Metropolitan Nashville Police Department officers testified at the suppression hearing. Jayne is assigned to patrol the James Casey Housing Development and has made numerous arrests in that area for drugs and trespassing. (Docket Entry No. 33, Transcript, at 6). Jayne describes this area a "high crime area, where there's lots of drug dealing, a much higher concentration of shootings and murders than other areas of the city. And also, pretty much daily, problems with people trespassing there." Id. at 5.

1

At approximately 5:44 p.m. on April 16, 2010, Jayne observed the Defendant standing with three adult females and two children on a public sidewalk near 632 South Seventh Street. Id. at 7-9. This sidewalk is adjacent to the James Casey Housing Development, Id. at 5, but is not on the housing development property. Id. at 12. According to Jayne, the Defendant "stuck out" because the Defendant was wearing a large sweatshirt with the hood pulled up and sunglasses on when the weather was sunny and in the 80s. Id. at 7. Defendant notes that the actual weather data for April 16, 2010 was a "mean temperature of 70 degrees Fahrenheit, with a high of 84 and a low of 56." (Docket Entry No. 22 at 2 n.1, citing http://www.wunderground.com/history/airportfrompws/KBNA/2010/4/16/DailyHistory.html?req_city=NA&req_statename=NA).[1]

Jayne drove by the Defendant in an unmarked patrol car, but Jayne explained that a person in this area would recognize his vehicle as a police vehicle with its visible spotlight, a light bar inside the windshield, and a Government license plate. (Docket Entry No. 33, at 9). According to Jayne, as he observed the Defendant, the Defendant "turned his back towards me and then continued to rotate as I drove up the street. Rotate so that his back stayed towards me." Id. at 8. Officer Jayne then drove "a little bit" and then "[m]ade a u-turn and came back and pulled over close to" the Defendant. Id. at 9. At the suppression hearing, Jayne explained:

> The way he was dressed just made me think of a guy named Antonio Flenoy that had two outstanding warrants. I had arrested him before, and he was wearing clothing that had that similar sergeant stripe pattern on the sleeves. And I knew that he was in the area of James Casey still, and so I thought that.
>
> \* \* \*

---

[1] Defendant also contends that "[A]t 5:53 p.m., winds averaged 12.7 miles per hour gusting to approximately 17 miles per hour with scattered clouds in the afternoon and the sun set at 7:17 p.m." (Docket Entry No. 34 at 2 n. 1). The cited website does not provide that gust speed at that time, but the website reports 23 miles per hour wind speed for that day with sunset at 7:21 p.m.

2

> I didn't feel a hundred percent sure that it was Antonio Flenoy; but between the way he was dressed, him being roughly of similar build to Antonio Flenoy, and it being unusual that he was dressed that way, so warmly on a summer day, and him kind of rotating, I pulled over to speak to him.

Id. at 8.

On cross-examination, Jayne conceded that he did not refer to Antonio Flenoy or the sergeant stripes on the Defendant's jacket in his police report on the Defendant's arrest. Jayne also did not refer to Flenoy in his application for an arrest warrant nor mention Flenoy in his testimony at a state preliminary hearing about his arrest of the Defendant. Id. at 25, 29, 40. Officer Norris who was present at the scene of the Defendant's arrest did not recall having any discussions with Jayne about the possibility of the Defendant being Flenoy. Id. at 76-77. Jayne had only encountered Flenoy once, two months earlier and admitted that Flenoy had dreadlocks and a lighter complexion than the Defendant. Id. at 27, 28.

At the time of his initial stop, Jayne "didn't think [the Defendant] was committing a crime." Id. at 31, 33. Jayne explained the rationale for this stop as follows:

> He wasn't actually on the property [of James Casey Housing Development], but he was probably within one or two steps of the property. And between when I had first seen him and when I pulled over to talk to him, he was standing basically in the same area. He did not appear to be using the sidewalk as a thoroughfare to go from one place to another.
>
> So, you know, just with being right there on the edge of the property, it seemed like he may have just come from being on MDHA property or might be about to go back onto MDHA property.

Id. at 12. Of the persons on the sidewalk, Jayne could not recall talking to anyone other than the Defendant. Id. at 11.

When he stopped his vehicle near the Defendant, Jayne radioed other officers that he was going to be speaking with someone who was standing on the sidewalk and provided a description of the Defendant. Id. at 9, 58. Jayne exited his vehicle that was "close to" the Defendant and approached the Defendant. Id. at 9. Officer Jayne was in uniform with his service revolver in his

3

holster. Id. at 14, 32-33. Jayne described his approach to the Defendant: "I just walked up to Terence. You know, Hey. How you doing? Engaged him in conversation." Id. at 10. In less than a minute, Id. at 10, Defendant provided Jayne his identification. Id. at 10, 14. Jayne described as "fairly quick" his decision that the Defendant was not Flenoy. Id. at 11, 34.

As Jayne was taking down the information from the Defendant's identification and within a minute or two after Jayne approached the Defendant, Norris arrived in his marked patrol car wearing a police uniform. Id. at 58-59, 66. Officer Norris stood in the open door of Officer's Jayne's vehicle with his back "turned towards" the Defendant. Id. at 61. Jayne explained that he was inquiring whether police records had the Defendant's name on a "banned list" for the housing complex or showed outstanding warrants for the Defendant. Id. at 38. Neither officer was previously acquainted with the Defendant. Id. at 10-11, 60.

Upon returning the Defendant's identification papers, Jayne asked the Defendant if he lived at the James Casey Homes or whether he was visiting there. Id. at 34-35, 60. Defendant told Jayne that he had been visiting his aunt's house, but he was not on the lease of the MDHA property. Id. at 29. According to Jayne, the Defendant was "not able to narrow the location down any more than just sort of generally pointing to the direction that he was coming from." Id. at 12-13, 34-36, 60. Jayne described his additional questioning of the Defendant as follows:

> Q. And how did the defendant respond to your questions?
>
> A. As far as his mannerism and everything, I mean, he was calm. And we just seemed to be having a conversation. He told me that he had been visiting his auntie, I believe was the term that he used. He was not able to give me a specific -- he was not able to narrow the location down any more than just sort of generally pointing to the direction that he said he was coming from.
>
> Q. Did you ask him for a specific apartment?
>
> A. Yes.
>
> Q. And he was unable to give you an apartment number or building?

4

> A. Correct.
>
> Q. Did you accuse the defendant of committing any crime?
>
> A. No.
>
> Q. And was it at that point that you then asked for the defendant's identification?
>
> A. I think I asked him about whether or not he lived over there first, and then got his ID.

Id. at 12-13.

Jayne confirmed that he did not suspect the Defendant of violating any law regarding MDHA property. Id. at 35. Neither officer accused Defendant of a crime. Id. at 13, 75-76. Yet, from the Defendant's responses, Jayne testified that the Defendant "didn't seem like he knew exactly where he came from either; which stands out as a kind of a red flag to me, based on my experience of talking to people on the property over there." Id. at 39. Jayne considered the Defendant's responses vague:

> And in my, you know, experience of stopping and talking to lots of people over there, an evasive or incomplete or undetailed response about -- you know, Are you visiting somebody over here? If so, you know, who are you visiting? You know, where do they live?
>
> If you get responses like, Well, I don't know who I'm visiting. I don't know their name and I don't know where they live. Then, to me, that's a little bit more of an indicator that they may be just over there kind of wandering around, seeing what they can get into.
>
> And when I asked Terence about that, his response about where he had been was just kind of over this way. There wasn't anything specific. So that did stick out to me a little bit.

Id. at 33-34.

Jayne did not expressly instruct the Defendant to remain and not leave the area, but Jayne testified "it was my preference that he stay and allow me to run his information" noting that the Defendant did not seem to want to leave. Id. at 38. At the State preliminary hearing, however, Jayne testified that he told the Defendant that he was not free to leave:

5

> Q. All right. Do you remember discussing with [the Defendant's state attorney] whether or not Mr. Whitson was free to leave at any point?
>
> A. Correct. Yes.
>
> Q. All right. So do you recall what your answer was to that?
>
> A. Well, I think he was kind of giving a blow by blow of was he free to leave then, was he free to leave then. **So there was definitely a point where I said no, he wasn't free to leave.**
>
> Q. **So you did at some point in that hearing say that Mr. Whitson was not free to leave before the gun dropped?**
>
> A. **That's correct.**

Id. at 47 (emphasis added). At the suppression hearing, Officer Norris testified that the Defendant would have been free to leave during that time. Id. at 69.

During Jayne's check of the banned list and within two to three minutes of his initial encounter with the Defendant, Jayne heard "some weight" hit the sidewalk. Id. at 15-16. The officers observed a female with the Defendant, later identified as Ashlie Patnode, who picked up a small handgun from the sidewalk and placed it in her purse. Id. at 15. Jayne drew his weapon, walked over to Patnode retrieved the firearm, and handcuffed Patnode and the Defendant. Id. at 16. Other officers arrived on the scene. Id. Jayne advised Defendant of his Miranda rights. Id. at 16-17. Defendant was taken off to the side for a "few minutes" and a "few minutes later" the Defendant denied that the firearm was his, but later the Defendant told the officers that he would "take the charge" and provided a detailed description of the firearm. Id. at 17-18.

## B. CONCLUSIONS OF LAW

The Fourth Amendment protects individuals from unreasonable searches and seizures and evidence that stems from unreasonable searches or seizures must be suppressed. Wong Sun v. United States, 371 U.S. 471, 488 (1963). "Under the Fourth Amendment, there are three types of permissible encounters between police and citizens: consensual encounters in which contact is

6

initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked some questions; a temporary involuntary detention or Terry[2] stop which must be predicated upon 'reasonable suspicion;' and arrests which must be based on probable cause." United States v. Alston, 375 F.3d 408, 411 (6th Cir. 2004) (quoting United States v. Bueno, 21 F.3d 120, 123 (6th Cir. 1994)).

Defendant argues that Jayne's initial contact with him was a Terry stop for which Jayne lacked reasonable suspicion. (Docket Entry No. 22, at 4-9). The Defendant argues:

> Whitson was with a group of people on a public sidewalk in front of public housing in a high crime area and was approached by an armed, uniformed officer who singled him out and asked him questions that amounted to an accusation of trespassing. See United States v. Williams, 615 F.3d 657, 666 (6th Cir. 2010). The questions asked are indicative of the officer's state of mind: he thought Whitson might have trespassed and his questions were clearly intended to get Whitson to incriminate himself.

(Docket Entry No. 34, at 6). In the alternative, Defendant argues that even if the initial encounter were consensual, he was improperly seized prior to the discovery of the weapon. (Docket Entry No. 28, at 2 and Docket Entry No. 34, at 6).

The Government responds that the entire stop, prior to discovery of the gun, was a consensual encounter. (Docket Entry No. 23, at 1, 6-7; Docket Entry No. 35, at 1-6). "The Government contends that the entire encounter between the Defendant and law enforcement was consensual, but assuming the consensual encounter evolved into a Terry Stop, the officers had reasonable suspicion that criminal activity may be occurring, justifying a brief detention." (Docket Entry No. 35, at 7).

Under Terry, "a police officer may in appropriate circumstances and **in an appropriate manner approach a person** for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest." 392 U.S. at 22 (emphasis added). As pertinent here,

---

[2] Terry v. Ohio, 392 U.S. 1 (1968).

7

Terry's actual holding was "where a police officer observes unusual conduct which leads him reasonably to conclude that criminal activity may be afoot..." a brief stop is permissible. Id. at 30. Later, the Supreme Court clarified that the facts that a person "looked suspicious" and was in a neighborhood frequented by drug users, standing alone, do not constitute reasonable suspicion of criminal conduct. Brown v. Texas, 443 U.S. 47, 49, 52 (1979). There, the Supreme Court acknowledged the right of officers to question, but such questioning must be "based on objective facts." Id. at 51. In Brown, police officers observed two men close to each other in an alley in an area with "a high incidence of drug traffic." Id. at 49. The Supreme Court's actual holding was that those facts were insufficient for a Terry stop: "When the officers detained appellant for the purpose of requiring him to identify himself, they performed a seizure of his person subject to the requirements of the Fourth Amendment." Id. at 50. Years later, the Supreme Court reiterated that a defendant's presence in a high crime area is a relevant consideration on a Terry stop, but "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable particularized suspicion that the person is committing a crime." Illinois v. Wardlow, 528 U.S. 119, 124 (2000).

A person's avoidance of an officer does not justify a Terry stop. The Supreme Court stated that "when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business." Id. at 125 (citing Florida v. Royer, 46 U.S. 491, 498 (1983)). Similarly, a person's "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." Florida v. Bostick, 501 U.S. 429, 437 (1991). Of note, in Wardlow, in an opinion concurring, in part and dissenting, in part, Justice Stevens observed: "To be sure, Illinois concedes, an innocent person—even one distrustful of the police—might 'avoid eye contact or even sneer at the sight of an officer,' and that would not justify a Terry stop . . ." 528 U.S. at 130-31.

8

To be sure, police officers do not seize a person "merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." United States v. Drayton, 536 U.S. 194, 200 (2002). Yet, "the Fourth Amendment simply does not allow a detention based upon an officer's gut feeling that a suspect is up to no good." United States v. Urrieta, 520 F.3d 569, 578 (6th Cir. 2008). For an investigatory stop, the officer must articulate a "particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortz, 449 U.S. 411, 417-18 (1981). The relevant inquiry "is not whether the particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." United States v. Sokolow, 490 U.S. 1, 10 (1989).

The Court is to consider the totality of the circumstances to discern whether Officer Jayne had reasonable, articulable suspicion based upon the specific facts that Defendant "'*has been*, is, or is about to be engaged in criminal activity.'" United States v. Hensley, 469 U.S. 221, 227 (1985) (quoting United States v. Place, 462 U.S. 696, 702 (1983)) (emphasis in original). For reasonable suspicion, the likelihood of criminal activity need not rise to the level required for probable cause, and satisfies the Fourth Amendment if "the officer's action is supported by reasonable suspicion to believe that criminal activity '"may be afoot."'" United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Terry, 392 U.S. at 30)). Reasonable suspicion "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" Arvizu, 534 U.S. at 273 (citations omitted).

### A. Validity of Initial Encounter

With these principles, the Court first addresses Officer Jayne's initial encounter with the Defendant. For a consensual encounter, "law enforcement officers may approach an individual and ask general questions without having any reasonable suspicion of criminal activity, **so long as the**

9

**officers refrain from the type of intimidating behavior that would lead a reasonable person to believe that the person was not free to leave.**" United States v. Waldon, 206 F.3d 597, 603 (6th Cir. 2000) (emphasis added).

> "Whether an encounter between a police officer and a citizen is consensual depends on the officer's objective behavior, not on any subjective suspicion of criminal activity. We know of no legal precedent suggesting a police officer can engage in a consensual encounter only with citizens whom he does not suspect of wrongdoing."

Id. Yet, a consensual encounter may become a Fourth Amendment seizure if, "in view of all of the circumstances . . . , a reasonable person would have believed that he was not free to leave. Examples . . . that might indicate a seizure . . . the threatening presence of several officers, the display of a weapon . . . , some physical touching . . . , or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." United States v. Wilhoite, No. 02-6373, 86 Fed. Appx. 945, 949-50 (6th Cir. Feb. 6, 2004) (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)).

The Defendant relies upon United States v. Williams, 615 F.3d 657, 662 (6th Cir. 2010) where two uniformed officers in a patrol vehicle observed a group of four to five individuals on the sidewalk next to a public housing complex. The officers recognized the defendant from a prior arrest and trespassing, approached only him, and immediately accused him of "again trespassing on CPO property." Id. An officer asked defendant if he had warrants and if he were armed, and based upon the Defendant's response, the officer conducted a pat-down revealing a firearm. Id. In holding that the defendant was seized in violation of Terry, the Sixth Circuit stated:

> Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Terry v. Ohio, 392 U.S. 1, 19 n. 16 (1968). "[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." Florida v. Bostick, 501 U.S. 429, 438 (1991); see also Michigan v. Chesternut, 486 U.S. 567, 573-74 (1988) (stating that an individual is seized if "a reasonable person would

have believed that he was not free to leave" and noting that the test is an objective one (internal quotation marks omitted)). In addition, an individual must actually submit to the show of authority to be seized within the Fourth Amendment. California v. Hodari D., 499 U.S. 621, 626 (1991); United States v. Jones, 562 F.3d 768, 774-75 (6th Cir.2009). For this reason, "a consensual encounter does not amount to a seizure." United States v. Campbell, 486 F.3d 949, 954 (6th Cir. 2007).

Officers do not seize people "merely by approaching individuals on the street or in other public places and putting questions to them." United States v. Drayton, 536 U.S. 194, 200 (2002). That said, "words alone may be enough to make a reasonable person feel that he would not be free to leave." United States v. Richardson, 385 F.3d 625, 629 (6th Cir.2004). We consider the following factors as evidence of a seizure: " 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.' " Campbell, 486 F.3d at 954 (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.)).

\* \* \*

...[The officers] did not draw their weapons or touch Williams. **But the fact that there were two officers, that they were in uniform and arrived in a marked police car, and that they immediately focused their attention on one person, Williams, in a group of four or five contributed to their show of authority. And although those facts alone would not reasonably make Williams feel that he could not leave, as the officers could have engaged him in a consensual encounter, the encounter differed markedly from those that we have deemed consensual. It did not involve a nonthreatening question, see United States v. Waldon,** 206 F.3d 597, 603 (6th Cir.2000) (defendant not seized when officer merely "asked ... what he was doing in the area"), **a request for identification that did not imply that compliance was mandatory, see Campbell**, 486 F.3d at 956 (defendant not seized when officer stated "that he would *like* to see [his] ID"), or a mere request to speak together, see United States v. Peters, 194 F.3d 692, 694, 698 (6th Cir.1999) (defendant not seized when officer approached and asked whether he could speak with him); United States v. Frazier, 936 F.2d 262, 265 (6th Cir.1991) (defendant not seized when two agents approached and inquired whether they could ask him some questions); United States v. Moore, 675 F.2d 802, 808 (6th Cir.1982) (DEA agent did not seize defendant when he approached him and inquired "Can I ask you a few questions" in nonthreatening manner). **Here, instead, Vass immediately accused Williams of a crime. A reasonable person would not have felt free to walk away under such circumstances.**

Id. at 663-664 (emphasis added and footnote omitted, italicized emphasis in original).

On these facts, the Sixth Circuit held that the officers lacked reasonable suspicion to stop the defendant.

11

> **Thus, the case for reasonable suspicion boils down to . . . because Williams was standing near CPO property and others in his group were standing on CPO property, where people have been known to trespass, he might have been trespassing just before [the officers] arrived or been getting ready to do so. . . [.]**
>
> **Such speculation is insufficient under the Fourth Amendment.** That Williams stood on a public sidewalk next to property on which trespassing is a problem is minimally probative of his recent or imminent trespassing. If anything, remaining on public property while others tread on the grass suggests an effort *not* to trespass. . . . In fact, the argument for trespassing is even more attenuated than that. There is no evidence that all of the other people in Williams's group were nonresidents of the CPO complex. Had at least one been a resident, the others would have been lawful guests. Thus, **the government's argument is really that Williams might have been trespassing because he was with other people who might have been trespassing. This sort of guesswork is not remotely enough for reasonable suspicion.**

Id. at 667-668 (emphasis in original).

The Court concludes that Terry, Brown and Williams control here.³ First, under Terry, the "manner" of Jayne's approach to the Defendant is a significant element of Terry. 392 U.S. at 22. Here, the circumstances of the stop here are that when the Defendant turned away from him, Jayne made an abrupt u-turn and pulled his police vehicle "close to" the Defendant who was on a public sidewalk. The other key facts are, based upon Jayne's testimony that his vehicle was readily identifiable as a police vehicle and Jayne called other officers, one of whom arrived within a minute. These facts establish a Terry stop at a point when Jayne lacked any reasonable suspicion.

Second, under Brown, "[w]hen the officers detained appellant for the purpose of requiring him to identify himself, they performed a seizure of his person subject to the requirements of the Fourth Amendment." 443 U.S. at 50. Here, Jayne stopped the Defendant to secure his identification and such a stop is a seizure under Brown. In his state court testimony that is closer in time to the arrest, Jayne told the Defendant that he was not free to leave. These facts also establish an impermissible stop without reasonable suspicion.

---

³ For this reason, the Court deems discussion of United States v. Townsend, 305 F.3d 537 (6th Cir. 2002) and United States v. Urrieta, 520 F.3d 569 (6th Cir. 2008) that the Defendant cites (Docket Entry No. 34, at 8) to be unnecessary.

Third, Defendant's turning away from Jayne, the Defendant's physical proximity to the housing property and Jayne's concern about a possible trespass on public housing property were the reasons for Jayne's stop of the Defendant. Under Williams, Jayne's suspicions did not constitute objective facts to justify his Terry stop of the Defendant. These collective facts represent a significant show of force on Jayne's initial encounter with the Defendant such that the Defendant was not free to leave. Thus, Jayne's conduct in his initial approach to the Defendant constituted a Terry stop.

As to whether Jayne's initial encounter here was justified by his belief that the Defendant was Flenoy, Jayne did not mention the Defendant as appearing to be Flenoy in his application for an arrest warrant, in his police report of the incident nor in his state court testimony nor to Norris who was present at this encounter. All of these events were closer in time to the events at issue. When Jayne approached the Defendant, Jayne did not ask the Defendant to remove his hood. Under these circumstances, the Court concludes the more likely reason for the stop was the Defendant's turning away from Jayne when Jayne first observed him. Under Bostic and Wardlow, such avoidance by the Defendant does not justify Jayne's stop of him.

Moreover, after checking the Defendant's identification papers with minutes, Jayne asked the Defendant questions about his presence inside the housing property. Such questioning reveals Jayne's suspicion was that the Defendant had trespassed on public housing property.[4] To be sure, "officers' subjective beliefs are irrelevant, unless communicated to the defendant," Mitchell v. United States, No. 05-6783, 233 Fed. Appx. 547, 550 (6th Cir. May 29, 2007), but "the subjective intent of the officers is relevant to an assessment of the fourth amendment implications of police conduct only to the extent that that intent has been conveyed to the person confronted." Waldon,

---

[4] But see United States v. Maine, No. 3:07-00096, 2008 WL 686215 (M.D. Tenn. Mar. 5, 2008), another trespassing case, where then Senior Judge Echols held a police stop to be a consensual encounter, but Maine did not involve the show of police force presented here.

13

206 F.3d at 603 (quoting United States v. Rose, 889 F.2d 1490, 1493 (6th Cir.1989) (citing Mendenhall, 446 U.S. at 554 n. 6 (1980)). See also Whren v. United States, 517 U.S. 806, 813 (1996) and United States v. Taylor, 956 F.2d 572, 576 n. 2 (6th Cir. 1992) (en banc).

To be sure, Jayne offered uncontroverted evidence that he approached the Defendant with a casual greeting and said something to the effect: "You know, Hey. How you doing? Engaged him in conversation." (Docket Entry No. 33, Transcript, at 10). The Government also cites the Defendant's cooperation, calm demeanor, in his answers to the officer's questions and Defendant providing his identification when asked. Yet, those facts, in all likelihood, reflect the Defendant's reasonable perception based on Jayne's show of authority, that he was not free to leave and needed to cooperate.

Thus, the Court concludes that under the facts here, a reasonable person who observed a police vehicle make an abrupt u-turn and pull his vehicle "close to" the person, would not believe that he or she was free to leave. Such facts are also inconsistent with a consensual encounter. Thus, the Court concludes that Jayne conducted a Terry stop without objective specific facts to justify that stop.

Accordingly, the Court concludes that the Defendant's motion to suppress (Docket Entry No. 22) should be granted.

An appropriate Order is filed herewith.

ENTERED this the 20th day of September, 2011.

WILLIAM J. HAYNES, JR.
United States District Judge